UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————

№ 14-cv-1752 (JFB)(GRB)

———————————

CAROL VALENTINE,

Plaintiff,

VERSUS

AETNA LIFE INSURANCE COMPANY,

Defendant.

———————————

**MEMORANDUM AND ORDER**
August 25, 2015

———————————

JOSEPH F. BIANCO, District Judge:

Plaintiff Carol Valentine ("plaintiff") brings this action under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"), challenging the termination of her long-term disability ("LTD") benefits by defendant Aetna Life Insurance Company ("Aetna," or "defendant"). Plaintiff was employed by Hubbard Broadcasting ("Hubbard"), where she was a participant in an LTD policy administered by Aetna (the "Plan"), until she allegedly became disabled under the provisions of the Plan due to a trigeminal nerve disorder. Plaintiff now challenges Aetna's partial rejection of her claim for LTD benefits. Specifically, plaintiff alleges that Aetna's finding that plaintiff's disability ended on June 30, 2012, and its resultant decision to terminate her benefits subsequent to that date was arbitrary and capricious.

Plaintiff and defendant now both move for summary judgment pursuant to Federal Rule of Civil Procedure 56. Defendant moves for summary judgment on the grounds that sufficient evidence in the record supports defendant's decision to deny plaintiff benefits in addition to those benefits already provided. Plaintiff cross-moves for summary judgment, asserting that the evidence in the record establishes that plaintiff had an ongoing disability, or in the alternative for a remand to the plan administrator for reconsideration of her claim. For the reasons set forth below, the Court denies defendant's motion, and grants plaintiff's motion to the extent that plaintiff's claim is remanded to Aetna for reconsideration.

I. BACKGROUND[1]

A. The Plan

The Plan is an employee welfare benefit plan governed by ERISA. ("ERISA Rights," VAL 38-39.) Hubbard established and maintains the Plan to provide LTD benefits to eligible employees, and Aetna acts as the Plan's claims administrator. (*Id.*)

1. Discretionary Authority

The Plan provides that:

> Under Section 503 of Title 1 of the Employee Retirement Income Security Act of 1974, as amended (ERISA), Aetna is a fiduciary. It has complete authority to review all denied claims for benefits under this policy. In exercising such fiduciary responsibility, Aetna shall have discretionary authority to:
>
> - Determine whether and to what extent employees and beneficiaries are entitled to benefits; and
> - Construe any disputed or doubtful terms of this policy.
>
> Aetna shall be deemed to have properly exercised such authority. It must not abuse its discretion by acting arbitrarily and capriciously. Aetna has the right to adopt reasonable:
>
> - policies;
> - procedures;
> - rules; and
> - interpretations;
>
> Of this policy to promote orderly and efficient administration.

("Policyholder and Insurance Company Matters" at "ERISA Matters," VAL 105.)

2. Eligibility for LTD Benefits

The Plan provides that

> From the date that you first become disabled and until Monthly Benefits are payable for 24 months, you will be deemed to be disabled on any day if:
>
> - You are not able to perform the **material duties** of your **own occupation** solely because of disease or **injury**; and
> - Your work earnings are 80% or less of your **adjusted predisability earnings**.
>
> After the first 24 months that any Monthly Benefit is payable during a period of disability, you will be deemed to be disabled on any day if you are not able to work at any **reasonable occupation** solely because of:
>
> - Disease; or
> - **Injury**.

---

[1] Unless otherwise indicated, all facts cited are undisputed. Further, all facts cited to Bates-stamped documents are taken from the Plan documents (VALENTINE ("VAL") 1-105), which were annexed as Exhibit A to the Declaration of Ana Molina ("Molina Decl.") in support of defendant's motion for summary judgment, and from Valentine's claim file (VAL 106-837), *i.e.* the administrative record, which was annexed as Exhibit B to the Molina Decl. (*See* ECF No. 19.)

("Long Term Disability Coverage" at "Test of Disability," VAL 4 (emphasis in original).) The Plan further states that:

> A period of disability starts on the first day you are disabled as a direct result of a significant change in your physical or mental condition occurring while you are insured under this Plan. You must be under the regular care of a **physician**. (You will not be deemed to be under the regular care of a **physician** more than 31 days before the date he or she has seen and treated you in person for the disease or **injury** that caused the disability.)
>
> Your period of disability ends on the first to occur of:
>
> - The date Aetna finds you are no longer disabled or the date you fail to furnish proof that you are disabled. . . .
> - The date an independent medical exam report or functional capacity evaluation fails to confirm your disability. . . .

("Long Term Disability Coverage" at "A Period of Disability," VAL 5 (emphasis in original).)

The Plan further provides that benefits are "payable after the elimination period ends for as long as the period of disability continues." ("Long Term Disability Coverage" at "When Benefits Are Payable," VAL 5.) The elimination period under the Plan is 180 days. ("Disability Coverage" at "Long Term Disability Benefits," VAL 33.)

B. Plaintiff's Disability

Valentine was employed by Reelz TV, an affiliate of Hubbard, as a Director of Ad Sales Planning starting on or about December 1, 2008, until her last day of work on November 15, 2011. (VAL 729.) Plaintiff's salary at the end of her employment was approximately $225,000 plus commissions, amounting to gross pay of $316,868.56 in 2011. (*Id.* at 490, 722.) Plaintiff's job description reflects that some of her duties were to conduct negotiations on advertising time, create marketing platforms, maintain current business while "aggressively" seeking new business, interact with clients/agencies and account executives including entertaining them at industry events, present competitive research, and travel out of town. (*Id.* at 652-53.) It also notes that her position required "average sitting, standing, and office-type movement," the "ability to stand and present to a group for many hours," the "ability to travel via taxi, bus, personal car, commercial airline & train," and "average lifting, moving and pulling abilities." (*Id.* at 653.)

On or about April 4, 2012, Valentine filed a claim for LTD benefits claiming to be disabled and unable to work as of December 14, 2011 due to symptoms related to her diagnosis of a "trigeminal nerve disorder, unspecified" originally caused by an injury to her trigeminal nerve during a root canal in February 2010. (*Id.* at 107-108, 120, 122.) Plaintiff alleged that her symptoms (which increased in November 2011 after another dental procedure) in combination with side effects from prescribed medication included "daily persistent headache" and "fatigue, diminished memory, poor concentration, clouded thought combined with constant pain," causing her neurocognitive effects which limited her work performance. (*Id.* at 120-22.)

3

Plaintiff's treating physician for her allegedly disabling condition during this period was Dr. David Sirois, DMD, PhD, a specialist in cranial nerve injuries.[2] (*Id.* at 107, 122.) Dr. Sirois submitted an Attending Physician Statement ("APS") in support of plaintiff's LTD claim, dated March 30, 2012. (*Id.* at 731-32.) In it, Dr. Sirois stated that plaintiff "suffers from constant moderate to severe head and facial pain which has also resulted in an unusual pattern of pain and dysesthesia affecting the back, occipital and upper extremity." (*Id.* at 731.) In addition to the neurocognitive issues, Dr. Sirois stated plaintiff exhibited objective symptoms of "diminished strength and widespread mechanical allodynia."[3] (*Id.*) Overall, he found that plaintiff was "disabled from her usual work activity." (*Id.*)

Dr. Sirois noted that, although he had noted mild improvement with treatment, "overall the prognosis is poor in that her condition is permanent and symptoms will remain to some degree indefinitely." (*Id.*) Dr. Sirois stated, "There is no objective test to prove or otherwise quantify her pain condition and I must rely on her self-report of limitations." (*Id.*) He also noted that he had prescribed plaintiff a number of medications, and that the side effects of those medications were part of plaintiff's disability, though as plaintiff's treatment evolved he planned to adjust her medications to ameliorate those effects. (*Id.*) Dr. Sirois concluded that plaintiff's prognosis would be clearer after six months of further treatment, *i.e.* through September 2012, and that he "reasonably expect[ed] she would remain disabled" during that period. (*Id.*) Dr. Sirois concurrently noted on the Aetna APS form that plaintiff's disability began on December 14, 2011 and would be continue "indefinite[ly] pending outcome to ongoing treatment." (*Id.* at 732.)

C. Initial Denial of Plaintiff's Claim

Aetna claim analyst Elizabeth Wing conducted a phone interview with plaintiff on April 16, 2012, after which she referred the claim to a nurse consultant, Jeanette Stehly, for a review. (*Id.* at 121-26.) Stehly reviewed plaintiff's records and concluded that her claim should be denied, finding that Dr. Sirois' APS indicated plaintiff "can work sedentary and he has not imposed restrictions yet it seems he is saying she is impaired."[4] (*Id.* at 125.) Stehly stated that Dr. Sirois did not provide sufficient "exam findings, diagnostics, etc. to support inability to perform job duties," and questioned how a trigeminal neuralgia could cause plaintiff's symptoms. (*Id.*)

After requesting and receiving further information from Valentine, including the older evaluations from Dr. Loria and Dr. Snyder, Wing conducted a phone interview

---

[2] Valentine had previously seen other doctors for her condition after the February 2010 root canal, including her primary care physician Dr. Jeffrey Loria and neurologist Dr. David Snyder. Sometime prior to May 2010, after plaintiff complained about numbness and pain resulting from the root canal, Dr. Loria referred her for a brain MRI, the findings of which were "nonspecific, not correlated [with] her symptoms." (VAL 664.) Dr. Loria also referred plaintiff to Dr. Snyder for a consultation in June 2010, who found that Valentine's cranial nerve, motor, and gait examinations were generally normal, and that plaintiff was "alert oriented, and cooperative with normal memory, language, and speech" though she was "rather anxious." (*Id.* at 683.)

[3] Dr. Sirois frequently described mechanical allodynia as "light touch perceived as painful."

[4] Stehly did not provide any further detail, and upon a review of the March 30, 2012 APS from Dr. Sirois, the Court cannot discern these purported inconsistencies.

4

with Dr. Sirois on May 14, 2012. (*Id.* at 152-53, 157.) During the interview, Dr. Sirois averred that his original APS was intended to state that plaintiff was disabled due to illness and pain, and that he would fill out a new APS if it would be helpful; though some of her symptoms (the diminished memory and poor concentration) were based on "self reports" and not on formal or structured testing, Dr. Sirois said he believed plaintiff's complaints, and that both the distraction caused by her illness/pain and the medications would cause her "fogged memory and difficulties in thought process." (*Id.* at 157.) The file was then referred back to Stehly, who again found that the records submitted were insufficient to support a finding of a functional impairment, pointing to the "highly subjective" nature of the claim and the lack of examination results to support a finding that plaintiff was unable to perform physical work. (*Id.* at 163.)

Defendant then referred plaintiff's claim file to an outside vendor for the retention of an independent medical record peer review physician consultant ("IPC"). (*Id.* at 343-48.) The IPC for the initial review of plaintiff's claim was Dr. Choon Rim, a neurologist. (*Id.*) Following a review of the records and a conversation with Dr. Sirois,[5] Dr. Rim, echoing Stehly, found that plaintiff's records did not support a finding of a functional impairment because her self-reported symptoms of pain and cognitive dysfunction "do not translate into functional impairments," and she was "not restricted from working her own medium level occupation." (*Id.* at 347.) Dr. Rim suggested that a "formal neuropsychological test would be helpful for the continued evaluation of the claimant's proclaimed functional impairments related to cognitive deficits." (*Id.* at 348.)

Defendant subsequently notified plaintiff by letter dated May 29, 2012, that her claim for LTD benefits had been denied.[6] (*Id.* at 220-21.) Plaintiff was advised that she was entitled to appeal her claim, and that she could submit in support, among other things, "a detailed narrative report for the period 11/15/2011 to the present outlining the specific physical and/or mental limitations related to your condition that your doctor has placed on you as far as gainful activity is concerned, physician's prognosis, including course of treatment, frequency of visits, and specific medications prescribed," and "diagnostic studies conducted during the above period, such as test results, X-rays, laboratory data, and clinical findings." (*Id.* at 221.)

D. Plaintiff's Appeal of the Initial Claim Denial

Plaintiff, via her counsel, filed an appeal letter on November 5, 2012, arguing that Aetna failed to "fully address the vocational limitations caused by [plaintiff's] medical

---

[5] During this conversation, Dr. Sirois allegedly stated that plaintiff was physical able to perform sedentary work, but that she was unlikely to be able to perform her previous duties in her job at Hubbard given her cognitive complaints. (VAL 346.) The Court notes that, as described *supra*, plaintiff's job required an average amount of physical activity, including the "ability to stand and present to a group for many hours."

[6] The Court notes that, around the time defendant notified plaintiff of the denial of her claim, Dr. Sirois submitted updated APS forms to Aetna dated May 24, 2012, in which he stated that Valentine was restricted from working because she was unable to perform the cognitive tasks required of her occupation due to widespread mechanical allodynia caused by her condition and the side-effects of her medication, and that he expected plaintiff to be able to return to "modified duty" work on or about September 1, 2012, consistent with his prior APS forms.

5

condition which manifests in chronic pain and causes [plaintiff] significant diminution of her ability to concentrate, requires her to take unscheduled breaks and whole or partial days off, and negatively affects her ability to deal with stress and interact with others. It is our contention that [plaintiff's] medically determinable condition causes severe pain which precludes her ability to return to the highly skilled and highly stressful executive position she had for Hubbard and has required her to attempt a less stressful and skilled position."[7] (*Id.* at 355-59.) On December 3, 2012, plaintiff submitted a supplementary appeal letter, attaching additional supporting records and documents. (*Id.* at 416-25.) The documents included, among other things: an updated narrative report from Dr. Sirois dated November 29, 2012 (*id.* at 497-501) and his supporting office visit notes (*id.* at 503-26); a report prepared by a retained vocational expert, Andrew Pasternak, M.A., CRC (*id.* at 461-67); a sworn affidavit from plaintiff dated November 30, 2012, describing her symptoms and physical limitations (*id.* at 457-59); and various Internet articles regarding plaintiff's condition. (*Id.* at 438-55.)

Dr. Sirois' narrative summarized his treatment of plaintiff from March 28, 2012 (the date of the visit prior to the completion of his previous APS form) onward, including synopses of his visit notes. He stated, since beginning treatment, plaintiff had experienced:

---

[7] Around the end of August 2012, plaintiff returned to work as an account executive for a different employer, which plaintiff described as a "sales job" without the executive functions or travel requirements of her position at Hubbard. (VAL 458.) The position allegedly paid a much lower base wage of $135,000. (*Id.*) Plaintiff expressly declined to supply a release authorizing defendant to contact her new employer. (*Id.* at 416.)

. . . an approximate 50% reduction in overall pain intensity. However, she still experiences frequent episodes of intense flaring pain. In addition to pain in the upper right oral quadrant and face, she also experiences: dysmorphic phantom sensations, hyperacusis, extreme sensitivity to environmental stimuli (touch, sound), occipital pressure pain, and weakness/dysesthesia of the right arm. . . . She is taking several medications . . . and experiences predictable side effects which additionally impair her quality of life and her ability to work, including: fatigue, sleepiness, dizziness, disorientation, cognitive impairment (reduced concentration, memory, focus); less able to multi-task and to manage complex decision making.

(*Id.* at 500.) Dr. Sirois' narrative and office notes reflect that, although plaintiff showed signs of improvement, during each of her full medical examinations (on March 28, May 23, July 11, August 28, September 19, and November 21) plaintiff consistently exhibited the objective symptom of mechanical allodynia, as well as the other subjective symptoms and side effects. (*Id.* at 497-501.) For example, on September 19, plaintiff informed Dr. Sirois that she continued to experience "global improvement," but also that she suffered from "flaring symptoms," including an episode of the worst occipital pressure she had ever suffered, as well as a new "right foot numbness every other day [associated] with night time dysesthesia lasting ~2

6

hours." (*Id.* at 499.) Plaintiff's medications continued to cause the same side effects of dizziness, fogginess, and diminished concentration. (*Id.* at 497-500.)

Dr. Sirois also listed plaintiff's restrictions, which he stated were in large part "self-reported by Ms. Valentine and have not been formally assessed/tested. However, her limitations are entirely consistent with her pain and medications, and in my years of experience as a recognized expert in persistent neuropathic pain are accurate and credible. Additionally, some of her most impactful symptoms (pain, impaired cognitive performance, hypersensitivity to environmental stimuli) have no objective, validated method of assessment." (*Id.* at 501.) Dr. Sirois stated plaintiff should be restricted in, among other things, her exertion (limits on her ability to lift things above ten pounds or over her shoulders including a computer bag, or walk/stand due to dizziness or disorientation), manual dexterity (limits on her right arm to conduct tasks such as grasping, holding, and writing), and her participation in "high-pressure situations which require quick decision making, complex decision making, and multi-tasking . . . due to medication side effects or as the direct result of her pain/sensory symptom intensity." (*Id.*) Overall, Dr. Sirois stated that:

> [I]n my experience [plaintiff[]] will continue current treatment in principal for several years. She has a permanent (lifetime) risk for her neuropathic symptoms to resume/continue. I predict that she will continue to improve during next 3-4 years to a point of significant pain and medication reduction that results in minimal impact on quality of life and work performance, and may always experience transient pain flares that resolve spontaneously or following medication adjustment.

(*Id.* at 500.)

The report from vocational expert Pasternak, dated November 4, 2012, largely aligned with Dr. Sirois' assessment. Pasternak interviewed plaintiff by phone and in person, reviewed her medical reports, and conducted research in recognized vocational resources. (*Id.* at 461-62.) Pasternak also reviewed plaintiff's new employment, which he described as having fewer responsibilities, including being under the supervision of someone occupying a position comparable to plaintiff's old job at Hubbard. (*Id.* at 465.) In sum, Pasternak found that plaintiff was "incapable of performing the duties of her former position as a Vice President of Sales/Marketing," given her moderate to severe restrictions in a number of areas, including the ability to maintain attention and concentration and to perform simple or complex tasks repetitively over a period of time. (*Id.* at 466.) Pasternak attributed this to plaintiff's chronic pain and its cognitive effects, her "Type A" personality, and the "extremely stressful and stress-producing" nature of her position at Hubbard. (*Id.* at 466-67.)

Plaintiff's affidavit further elaborated on the symptoms she allegedly was experiencing day-to-day. In particular, plaintiff described that the "neuralgia and permanent nerve damage" she had suffered and the side effects of the multiple medications she was taking caused her to have sensitivity to atmospheric noise or voices on the phone; sensitivity to touch, causing difficulty in traveling; inability to focus, and headaches when she attempts to

7

work on one task for an extended period; effects on memory; drowsiness; and extreme pain. (*Id.* at 457-58.) Plaintiff noted that she had returned to work in a lesser capacity than her previous position, but that she was unsure if she would be able to continue due to her condition. (*Id.* at 458-59.)

### E. Defendant Partially Reverses the Initial Denial of the Claim

After receiving plaintiff's submitted records and examination reports, defendant again referred plaintiff's file to another IPC, Dr. Stuart Rubin, who is certified in Physical Medicine and Rehabilitation. (*Id.* at 280, 283.) Dr. Rubin reviewed the claim record and called Dr. Sirois on three occasions to conduct a peer-to-peer consultation, but was unable to reach him, and Dr. Sirois did not return the calls.[8] (*Id.* at 282.)

Notably, the "brief claim synopsis" section of the report describes the full contents of plaintiff's claim file as reviewed by Dr. Rubin, including Dr. Sirois' letter of November 29, 2012 and his office visit notes through September 29, 2012 (*id.* at 280-81), but Pasternak's report and plaintiff's affidavit are not listed. Further, in Dr. Rubin's description of his "clinical file review," he outlines plaintiff's medical history based on his review of plaintiff's file, but only through March 30, 2012.[9] (*Id.* at 281-82.) Dr. Rubin does not at any point in his IPC report reference Pasternak's vocational expert report, Dr. Sirois' November 29, 2012 narrative, or any of the examinations Dr. Sirois conducted of plaintiff subsequent to March 30, 2012. Dr. Rubin's summary of plaintiff's medical history ends with a rundown of plaintiff's March 30, 2012 office visit, and what appears to be a summary of Dr. Sirois' prior APS narrative, issued that same day. (*Id.* at 281-82.)

Dr. Rubin issued his report on January 30, 2013, and concluded that the records and examinations supported a finding of plaintiff's functional impairment from the initial date of the claim through June 30, 2012. (*Id.*) Specifically, Dr. Rubin found that the records showed that plaintiff was suffering from impairments including "chronic neuropathic pain affecting the face, allodynia, diminished neurocognition, diminished memory, and poor concentration" from December 14, 2011 through March 30, 2012; Dr. Rubin, however, opined that "[i]t is reasonable that these impairments will continue for another three months through 6/30/12." (*Id.*)

Dr. Rubin stated that "[f]unctional impairment is not supported from 7/1/12 through 8/19/12.[10] The rationale for this is based on the paucity of records which describe the patient's physical examinations, cognitive evaluations, or functional examinations or correlation of such during the time period in question." (*Id.*) Dr. Rubin noted that, during the period of functional

---

[8] Defendant also notified plaintiff's counsel by letter dated January 22, 2013, that the claim had been referred to the IPC. (VAL 234.) Defendant also advised plaintiff that it was attempting to reach her treating physician, so resolution of the appeal would be somewhat delayed. (*Id.*)

[9] This section states that plaintiff's "job description was reviewed from 4/26/12," but does not reference any other files, records, or information dated subsequent to March 30, 2012.

[10] Though plaintiff's claim included a request for continuing benefits after August 19, 2012, Dr. Rubin appears to have been under the mistaken impression that this was the end date of the claim. This may explain his failure to discuss some of the records subsequent to that date in his report, such as Pasternak's report and Dr. Sirois second narrative and office visit notes.

impairment, claimant would not have been able to perform the "significant cognition demanding tasks" of her position at Hubbard "in an effective or safe manner." (*Id.*) Dr. Rubin stated that the records reflected that plaintiff's medications—which she continued to be prescribed well through and after August 19, 2012, according to Dr. Sirois' notes—were causing her side effects including "poor cognition, poor memory, and decreased neurocognition and poor focus ability." (*Id.* at 283.)

Aetna allegedly mailed Dr. Rubin's IPC report to Dr. Sirois on February 6, 2013, and demanded that he review and respond to the report (including whether or not he agreed with the conclusions) within five calendar days. (*Id.* at 234.) Dr. Sirois did not respond. On March 1, 2013, defendant notified Valentine that it had decided to adopt the opinion of Dr. Rubin, partially overturn its previous denial of her claim and grant her benefits through June 30, 2012, noting that the IPC found that plaintiff's functional impairment was supported by the medical records through March 30, 2012, and it would have been reasonable to expect those impairments to continue only for another three months. (*Id.* at 237.) Defendant's letter, which for the most part mirrors Dr. Rubin's report, did not reference any of the medical examinations or reports from Dr. Sirois or Pasternak subsequent to March 30, 2012. The letter stated, "There is a lack of medical findings (i.e. examination findings as of July 1, 2012, cognitive evaluations, or functional examination or correlations, etc.) to support Ms. Valentine's inability to perform the material duties of her own occupation from July 1, 2012 and onward." (*Id.*)

II. PROCEDURAL HISTORY

Plaintiff filed the complaint on March 18, 2014. On April 25, 2014, defendant filed its answer. On October 22, 2014, defendant filed its motion for summary judgment. On November 21, 2014, plaintiff filed her cross-motion for summary judgment. Defendant filed its reply in support of its motion and opposition to plaintiff's motion on December 22, 2014. Plaintiff filed her reply in support of her cross-motion on January 9, 2015. Defendant filed an additional reply in support of its motion to strike plaintiff's extra-record submissions on January 16, 2015. The Court heard oral argument on February 6, 2015. Defendant submitted a supplemental letter regarding ERISA's requirements regarding the inclusion of certain language in the Plan on February 11, 2015. Plaintiff submitted a response on February 13, 2015. The matter is fully submitted.

III. STANDARD OF REVIEW

A. Summary Judgment

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir. 2006). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2004). The court "is not to weigh the evidence but is instead required to view the evidence in

9

the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (holding that summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*." *Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (internal quotations omitted). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (internal quotations omitted).

B. Benefit Determinations Under ERISA

A denial of benefits under ERISA "'is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" *Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 622 (2d Cir. 2008) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). "If the insurer establishes that it has such discretion, the benefits decision is reviewed under [an] arbitrary and capricious standard." *Id.*; *see also Celardo v. GNY Automobile Dealers Health & Welfare Trust*, 318 F.3d 142, 145 (2d Cir. 2003) ("The Supreme Court . . . has indicated that plans investing the administrator with broad discretionary authority to determine eligibility are reviewed under the arbitrary and capricious standard.").

Here, the Plan explicitly affords defendant such discretionary authority.[11]

---

[11] Plaintiff originally argued in the briefing that the arbitrary and capricious standard did not apply because the Plan included language stating: "The people who operate your Plan, called 'fiduciaries' of the Plan, have a duty to do so prudently and in your interest and that of other plan participants and beneficiaries. . . ." (*See, e.g.*, Pl.'s Reply, ECF No. 30, at 5-6 (citing VAL 39).) Plaintiff argued that, because of this language regarding Aetna's fiduciary duty, defendant's discretion in adjudicating plaintiff's claim was somehow constrained. (*Id.*) At oral argument and in a supplementary letter (ECF No. 34), defendant noted that the Department of Labor ("DOL") in 29 C.F.R. § 2520.102-3(t)(1)—pursuant to its authority to "require that the administrator of any employee benefit plan furnish . . . a statement of the rights of participants and beneficiaries under [ERISA]" under section 1024(c) of ERISA—mandates that ERISA plan administrators include language similar to the above as a statement of beneficiary rights. 29 C.F.R. § 2520.102-3(t)(2) provides proposed form language which is nearly

Therefore, the Court will apply the arbitrary and capricious standard in reviewing Aetna's decision to deny plaintiff her full claim benefits as well as the appellate process Aetna provided plaintiff. *See Zervos v. Verizon New York, Inc.*, 277 F.3d 635, 647-48 (2d Cir. 2002) (affirming district court's holding that insurer's appellate process was "arbitrary and capricious"); *see also Marasco v. Bridgestone/Firestone, Inc.*, No. 02-CV-6257, 2006 WL 354980, at *4 (E.D.N.Y. Feb. 15, 2006) ("Under ERISA, a plan administrator must provide an employee whose claim for benefits has been denied with a 'full and fair review.' 29 U.S.C. § 1133(2). Failure to conduct a 'full and fair review' can be grounds for finding that a plan administrator's decision was arbitrary and capricious.'") (citing *Crocco v. Xerox Corp.*, 137 F.3d 105, 108 (2d Cir. 1998)).

In particular, according to the Second Circuit, an administrator's decision is arbitrary and capricious "if it was 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Krauss*, 517 F.3d at 623-24 (quoting *Fay v. Oxford Health Plan*, 287 F.3d 96, 104 (2d Cir. 2002)). In particular, "[s]ubstantial evidence is 'such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [administrator and] . . . requires more than a scintilla but less than a preponderance.'" *Celardo*, 318 F.3d at 146 (quoting *Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir. 1995)).

Thus, [u]nder the arbitrary and capricious standard, the scope of judicial review is narrow." *Celardo*, 318 F.3d at 146; *see also Miller*, 72 F.3d at 1070 ("When an employee benefit plan grants a plan fiduciary discretionary authority to construe the terms of the plan, a district court must review deferentially a denial of benefits. . . ."); *Lee v. Aetna Life and Cas. Ins. Co.*, No. 05 Civ. 2960, 2007 WL 1541009, at *4 (S.D.N.Y. May 24, 2007) ("Under the arbitrary and capricious standard of review, Aetna's decision to terminate benefits is entitled to deference. . . ."); *Butler v. New York Times Co.*, No. 03 Civ. 5978, 2007 WL 703928, at *3 (S.D.N.Y. Mar. 7, 2007) ("Under the 'arbitrary and capricious' standard the scope of review is a narrow one. A reviewing court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" (quoting *Bowman Transp. Inc. v. Ark. Best Freight Sys.*, 419 U.S. 281, 285 (1974))); *Greenberg v. Unum Life Ins. Co. of America*, No. 03-CV-1396, 2006 WL 842395, at *8 (E.D.N.Y. Mar. 27, 2006) ("Decisions of the plan administrator are accorded great deference: the court may not upset a reasonable interpretation by the administrator. . . . Accordingly, it is inappropriate in this setting for the trial judge to substitute his judgment for that of the plan administrator.") (citations and quotation marks omitted).

---

identical to the fiduciary language cited by plaintiff from the Plan. Plaintiff in her supplementary letter concedes that the language in the Plan was "substantially similar to the model language," and seemingly agrees that the arbitrary and capricious standard applies in the case at bar, though she maintains that the defendant's "broad range of discretion" did not allow it to "abandon its position as fiduciary and act like a party seeking profit in an arm's length transaction." (ECF No. 35.) In any event, the Court agrees with defendant that the arbitrary and capricious standard applies in this case. Accepting plaintiff's argument would eviscerate the applicability of the arbitrary and capricious standard, because it would mean that the standard could not be applied to claims decisions made by administrators of any ERISA plan containing similar "fiduciary" language—which would be every plan and every claims decision, given that the language is required by DOL regulation.

C. Role of the Administrative Record

"The legal standard for considering evidence outside the administrative record depends on the standard of review to be applied to the claim. For a *de novo* review of the administrator's decision, 'the district court ought not to accept additional evidence absent good cause.' [*Zervos*, 277 F.3d at 646.] For a review under the 'arbitrary and capricious' standard, however, 'a district court's review . . . is limited to the administrative record. *Miller*, 72 F.3d at 1071." *Parisi v. Unumprovident Corp.*, No. 03-CV-1425, 2007 WL 4554198, at *8 (D. Conn. Dec. 21, 2007); *see Miller*, 72 F.3d at 1071 ("We follow the majority of our sister circuits in concluding that a district court's review under the arbitrary and capricious standard is limited to the administrative record."); *Fitzpatrick v. Bayer Corp.*, No. 04 Civ. 5134, 2008 WL 169318, at *9 (S.D.N.Y. Jan. 17, 2008) ("In assessing whether the decision of the administrator was reasonable, the court may not consider extrinsic matters but must remain within the bounds of the administrative record considered by the plan's decision-maker.") (citation and quotation marks omitted); *Leccese v. Metro. Life Ins. Co.*, No. 05-CV-6345, 2007 WL 1101096, at *5 (W.D.N.Y. Apr. 12, 2007) ("The Second Circuit has considered whether a district court should consider evidence that was not before the plan administrator and held that additional evidence may be considered upon *de novo* review of an issue of plan interpretation. However, since the parties agree that the standard of review in this case is arbitrary and capricious, the Court is limited to a review of the record as it existed before the plan administrator.") (citations and quotation marks omitted); *Nelson v. Unum Life Ins. Co. of Am.*, 421 F. Supp. 2d 558, 572 (E.D.N.Y. 2006) ("Thus, in determining whether Unum's denial of benefits was arbitrary and capricious, it is proper to consider nothing more and nothing less than the administrative record."), *aff'd*, 232 F. App'x 23 (2d Cir. 2007); *Gaboriault v. Int'l Bus. Machines Corp.*, No. 05-CV-91, 2006 WL 3304213, at *1 (D. Vt. Nov. 13, 2006) ("Where a plan grants the plan fiduciary such discretionary authority, the Court is required to limit its review of a denial of benefits to the administrative record. . . ."). Therefore, in analyzing whether Aetna's decisions were arbitrary and capricious, the Court has confined its review to the administrative record.[12]

IV. DISCUSSION

Defendant argues that its decision to deny plaintiff any benefits beyond June 30, 2012, was not arbitrary and capricious because plaintiff did not submit sufficient evidence, such as clinical findings or objective test results, to support a functional impairment after that date.[13] Plaintiff, on

---

[12] Defendant's motion to strike plaintiff's extra-record submissions—(1) Valentine's November 16, 2014 affidavit (ECF No. 27-4), and (2) paragraphs 4-12 and Exhibits 1-3 of the Epstein Declaration (ECF No. 27-5)—is therefore granted, because those materials were not in front of defendant, the plan administrator, at the time it reviewed plaintiff's claim. Those materials have therefore not been considered by the Court in deciding the motions for summary judgment. Plaintiff's arguments in support of the consideration of those materials—that the materials are relevant and were created as soon as possible after Aetna decided to partially reverse its initial denial of plaintiff's claim on appeal, and that defendant allegedly denied plaintiff's request to reopen the appeal (*see* Pl.'s Reply, ECF No. 30, at 7-8)—are unavailing given the clear rule that prohibits consideration of materials outside the administrative record under these circumstances.

[13] Under Second Circuit law, plaintiff "has the burden of proving by a preponderance of the evidence that [s]he is totally disabled within the meaning of the plan." *Paese v. Hartford Life and Accident Ins. Co.*, 449 F.3d 435, 441 (2d Cir. 2006) (citation and quotation marks omitted); *see also Vormwald v.*

the other hand, argues that there was ample evidence in the record, including consistent and clear clinical examination findings from Dr. Sirois and the Pasternak report, to support a finding that plaintiff was disabled such that she could not perform the duties of her position at Hubbard. Plaintiff argues that defendant's failure to address that evidence in its evaluation of her claim denied her a full and fair review.[14]

"It has long been the law of this Circuit that 'the subjective element of pain is an important factor to be considered in determining disability.'" *Connors v. Connecticut Gen. Life Ins. Co.*, 272 F.3d 127, 136 (2d Cir. 2001) (quoting *Mimms v. Heckler*, 750 F.2d 180, 185 (2d Cir. 1984.) Although plan administrators adjudicating claims involving such inherently subjective disorders—and, in turn, courts reviewing challenges to denials of those claims—are not required to take such assertions of incapacity at face value, they may not dismiss them out of hand without adequate attention to the claimant's complaints. In *Miles v. Principal Life Ins. Co.*, the plaintiff-appellant, a partner in a law firm, claimed that he was forced to stop working due to "bilateral tinnitus (high frequency noises in both ears), intractable ear and head pain, and a feeling of disorientation." 720 F.3d 472, 475-76 (2d Cir. 2013). During the LTD insurance company's initial review of the claim, it found that plaintiff-appellant's complaints were almost entirely subjective, and two independent reviewing physicians hired by Principal, the defendant-appellee LTD insurance company, found that there was a lack of objective findings to support restrictions on work activities or neurological impairments. *Id.* at 479-80. Principal therefore initially denied the claim, informing Miles that if he were to appeal, he should provide "medical information, testing, and results to meet his burden of proof," including such items as "[r]esults of cognitive testing with findings of the severity that they [sic] impact your ability to concentrate." *Id.* at 481 (internal quotation marks omitted). Miles appealed the initial denial of his claim, and submitted additional medical records in support of his appeal, including updated reports and testing from his doctors as well as a report from a physical therapist and a new ear, nose, and throat specialist.[15] *Id.* Principal again retained independent physicians to review

---

*Liberty Mut. Life Assurance Co. of Boston*, No. 05-CV-671, 2007 WL 2461781, at *3 (N.D.N.Y. Aug. 23, 2007) ("The claimant has the burden of proving by a preponderance of the evidence that she is disabled in accordance with the plan's terms."); *Graham v. First Reliance Standard Life Ins. Co.*, No. 04 Civ. 9797, 2007 WL 2192399, at *1 (S.D.N.Y. July 31, 2007) ("Plaintiff bears the burden of proving that he is totally disabled within the meaning of the plan by a preponderance of the evidence."); *Alexander v. Winthrop, Stimson, Putnam and Roberts Long Term Disability Coverage*, 497 F. Supp. 2d 429, 434 (E.D.N.Y. 2007) ("Plaintiff bears the burden of proving her entitlement to benefits.").

[14] Plaintiff further asserts that the record shows that the inherently subjective nature of plaintiff's trigeminal nerve condition, in which her pain and the side effects of her medications are primary drivers of her disability, means that objective testing is neither effective nor necessary to establish plaintiff's disability, and that defendant had the ability to send plaintiff for neurocognitive testing during the claims process but chose not to. Plaintiff also argues that defendant's position is undermined by its adoption of Dr. Rubin's report, which found sufficient evidence to demonstrate a functional impairment through March 30, 2012, plus a three-month continuation period, without addressing the comparable evidence in the record subsequent to that date.

[15] One of Miles' doctors noted, "It is a roaring tinnitus which is constantly in [Miles's] head. In addition, he has significant ongoing headaches due to the tinnitus. He has been fully worked up and has had all treatment modalities that are available, yet despite this, the hearing loss has remained profound. . . . [The tinnitus] is a subjective complaint." *Miles*, 720 F.3d at 481.

the claim, who again found that—despite the diagnosis by Miles' treating physicians based on their assessment of his subjective complaints as well as some objective findings such as "hearing loss" and "vestibular weakness"—the "objective data" in the record suggested that he had "no *physical* limitations or restrictions" and his "self-reported complaints cannot be explained by any known neurological condition." *Id.* at 483-84 (emphasis in original). Principal therefore again denied the claim, and the district court upheld the denial of the claim, holding that Principal "(1) reasonably relied on Miles's failure to demonstrate 'restrictions and limitations' as a basis to deny his claim; (2) did not err by failing to expressly state whether it credited Miles's subjective complaints; and (3) reasonably required objective proof of a significant impairment." *Id.* at 484-85.

The Second Circuit vacated the decision of the district court for several reasons. First, the Second Circuit found that Principal erred by failing to "give adequate attention to Miles's subjective complaints, as it failed to either assign any weight to them or to provide specific reasons for its decision to discount them." *Id.* at 486-88. The court of appeals found that Principal's disregard for Miles' subjective complaints solely because of their subjectivity, without any other valid reason to discount the evidence in the record, was arbitrary and capricious. *Id.* Second, the Second Circuit held that Principal's request for objective evidence that Miles was suffering from tinnitus was unreasonable, given that Principal did not itself identify to the claimant any test which would provide conclusive, objective evidence of his impairment. *Id.* at 488-89. Third, the Second Circuit found that Principal "failed to support many of its assertions with sound reasoning in the record and, in some instances, made assertions that are contradicted by the record." *Id.* at 489-90. For example, Principal appeared to ignore aspects of the record which explained the uptick in the claimant's symptoms before he left work and instead stated that he "failed to explain why he ceased work," which the court found was "a selective reading of the record that is not reasonably consistent with the record as a whole." *Id.* at 489. Therefore, the Second Circuit reversed the district court, and instructed it to return the matter to the plan administrator for reconsideration of the claim on the full evidentiary record. *Id.* at 490.

Here, after a careful review of the administrative record with respect to Valentine's claim, the Court finds that this case bears a strong resemblance to *Miles*. Dr. Rubin's IPC report—which defendant cites as the basis for its partial reversal of the initial denial of plaintiff's claim, wherein it accepted plaintiff's claim through June 30, 2012, and denied her benefits subsequent to that date (*see* VAL 237; Def.'s Mem. of Law, ECF No. 22, at 22-23)—is utterly perplexing when compared to the administrative record. Dr. Rubin first determined that plaintiff's functional impairment was supported through March 30, 2012, based on her subjective complaints and the supporting medical records regarding her "chronic neuropathic pain affecting the face, allodynia, diminished neurocognition, diminished memory, and poor concentration." (VAL 282.) Dr. Rubin then opined, without further explanation, that it "is reasonable that these impairments will continue for another three months through 6/30/12."[16] (*Id.*) Dr. Rubin then

---

[16] The Court does not mean to say that physicians cannot engage in reasoned analysis as to the likelihood of symptoms continuing for some period of time. Dr. Rubin's statement here, however, is

14

stated that functional impairment was not supported subsequent to June 30, 2012, "based on the paucity of records which describe the patient's physical examinations, cognitive evaluations, or functional examinations or correlation of such during the time period in question."[17] (*Id.*)

The Court finds these statements to be entirely inconsistent with the overall administrative record. Dr. Rubin clearly credited plaintiff's objective and subjective symptoms—based on the supporting medical records provided by Dr. Sirois—in finding that her functional impairment was proven through March 30, 2012, and provided an extensive summary of Dr. Sirois' visit notes through that date in his report. Then, without explanation or, indeed, any discussion whatsoever, Dr. Rubin seemingly ignored the entire administrative record subsequent to that date, including the updated November 29, 2012 APS report from Dr. Sirois, the supporting office visit notes, and plaintiff's affidavit—all of which reflect that plaintiff was suffering from similar objective and subjective symptoms, and was prescribed similar medications, through the date of her appeal—as well as the findings in the Pasternak report. In fact, there is not a single reference to any of these documents in either Dr. Rubin's IPC report or Aetna's final determination letter to plaintiff. This omission could be partially explained by the fact that some of these records—including plaintiff's affidavit and the Pasternak vocational expert report—are not listed in the "brief claim synopsis" section of Dr. Rubin's report as being part of the record he reviewed.

Dr. Rubin instead concluded, without explanation, that there was a "paucity of records" to describe plaintiff's medical, cognitive, and functional examinations and evaluations after March 30, 2012. Although the Court does not conclude that the medical records contained in Valentine's claim file irrefutably support a disability finding, the administrative record in this case certainly could not be described as having a "paucity" of records regarding all of those topics subsequent to March 30, 2012. As discussed above, Dr. Sirois' APS report and office visit notes alone describe multiple medical examinations of plaintiff, in which she showed some measure of improvement over time, but nonetheless consistently displayed the same objective and subjective symptoms and medication side effects (including mechanical allodynia, chronic pain, tiredness, fogginess, and diminished concentration) that Dr. Rubin described as being present in the records prior to March 30, 2012. (VAL 497-526.) Dr. Sirois concluded that these symptoms caused her to be functionally impaired such that she could perform her old job at Hubbard throughout this time. (VAL 500-01.)

---

seemingly based on nothing more than conjecture (pointing to nothing in the record or elsewhere as support for his timeline), and directly contradicts the estimates contained in Dr. Sirois' reports and visit notes as to how long plaintiff will continue to suffer from her symptoms. (*See, e.g.*, VAL 500 ("[Plaintiff] has a permanent (lifetime) risk for her neuropathic symptoms to resume/continue. I predict that she will continue to improve during next 3-4 years to a point of significant pain and medication reduction that results in minimal impact on quality of life and work performance, and may always experience transient pain flares that resolve spontaneously or following medication adjustment.").)

[17] Dr. Rubin also somewhat inexplicably asserted, in response to a question on the IPC form as to the restrictions or limitations imposed by plaintiff's treating physician during the claim period and whether they were supported by the medical evidence, that "[i]t is unclear why the claimant was unable to work at all during the time period in question." (VAL 283.) This statement appears to directly contradict Dr. Rubin's conclusion that the medical evidence supported plaintiff's functional impairment up until June 30, 2012.

15

Pasternak's vocational expert report and plaintiff's affidavit provide additional support for these findings. Aetna, therefore, clearly failed to "assign any weight" or "provide specific reasons for its decision to discount" plaintiff's subjective (or objective) complaints, supported by the findings of her treating physician and vocational expert. *Miles*, 720 F.3d at 486-88. While defendant is not required to accept plaintiff's evidence, including her subjective complaints, at face value, it must "properly consider[] and reject[]" that evidence "for specific reasons supported by the record."[18] *St. Onge v. Unum Life Ins. Co. of Am.*, 559 F. App'x 28, 30 (2d Cir. 2014). Here, it is not clear to the Court that defendant considered this evidence at all.

Defendant points to a number of cases in which courts have upheld the denial of LTD claims involving disabilities largely based on subjective complaints by the claimant where the claims were unsupported by objective evidence in the record. (*See* Def.'s Mem. of Law at 20 (citing *Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 88 (2d Cir. 2009); *Fortune v. Long Term Group Disability Plan for Employees of Keyspan Corp.*, 391 F. App'x 74, 77-79 (2d Cir. 2010); *Schnur v. CTC Comm. Corp. Group. Disability Plan*, No. 05 Civ. 3297 (RJS), 2010 WL 1253481, at *14-15 (S.D.N.Y. March 29, 2010), *aff'd*, 413 F. App'x 377 (2d Cir. 2011); *Orndorf v. Paul Revere Life Ins. Co.*, 404 F.3d 510, 526 (1st Cir. 2005); *Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 322 (7th Cir. 2007))). The issue in those cases, however, was whether or not the claim administrator was entitled to deny the claim for a lack of objective evidence or whether the competing evidence was according the proper comparative weight, *not* whether the review of the claim failed to adequately address significant portions of the evidence submitted by the claimant. Those cases are, therefore, unavailing here.[19]

---

[18] At oral argument, defendant's counsel offered his opinion that the "only conclusion to be reached" is that Dr. Rubin found some substantive difference in plaintiff's medical examinations that indicated her condition had improved such that she was no longer disabled, possibly based on plaintiff's return to work in August 2012 or Dr. Sirois' statements in his APS narrative that plaintiff had experienced some reduction in pain intensity. These possible justifications, however, are not contained in Dr. Rubin's analysis (or anywhere else in the record), and, thus, are based simply on counsel's speculation. The Court cannot divine such nuances in Dr. Rubin's analysis from the simple phrase "paucity of records," especially when (1) there is little indication that Dr. Rubin reviewed any of the medical records after March 30, 2012; (2) Dr. Rubin found plaintiff's disability to have ended on June 30, 2012, after a "reasonable" three month period where (in his opinion) her symptoms would have continued, not because of any purported improvement; and (3) plaintiff submitted significant medical evidence that she was disabled through the date of her appeal (comparable to the evidence Dr. Rubin credited in granting plaintiff's claim for the earlier period).

[19] The Court notes, however, that defendant appears to argue that it was entitled to discount plaintiff's subjective complaints because it purportedly warned plaintiff when her claim was initially denied that she should support her appeal with objective or clinical medical findings. Defendant is correct that the Second Circuit has held that "it is not unreasonable for a plan administrator to require [objective] evidence [of a disability] so long as the claimant was so notified." *Hobson*, 574 F.3d at 88 (citing *Johnson v. Metro. Life Ins. Co.,* 437 F.3d 809, 813-14 (8th Cir. 2006)). Although the claim administrator is entitled to make the factual determination as to whether a condition is amenable to objective clinical findings, it must clearly identify what objective findings are required to the claimant. *See Miles*, 720 F.3d at 488-89 ("Principal did not identify any objective findings that, considering Miles's symptoms, it would reasonably have expected to see. Under these circumstances, we conclude that it was unreasonable for Principal to rely on the lack of objective evidence of tinnitus to deny Miles's claim."); *Hobson*, 574 F.3d at 88 (plaintiff specifically informed of the need to provide "trigger point findings" to support a diagnosis of fibromyalgia). However, in this case, Dr. Rim's IPC

For these reasons, even under the deferential standard of review that the Court must accord to defendant's claim determination, the Court concludes that Dr. Rubin's report and Aetna's corresponding denial of plaintiff's claim after June 30, 2012, failed to address substantial parts of Valentine's claim file, and are, therefore, "not reasonably consistent with the record as a whole." Accordingly, the Court finds Aetna's partial denial of plaintiff's claim to have been arbitrary and capricious because it failed to address substantial evidence in the record.[20]

## V. REMEDY

As discussed above, Aetna failed to fully and fairly review aspects of plaintiff's evidence during its claim administration process. The Court does not conclude that Valentine's claim, upon full consideration of the record, must necessarily be granted. In other words, the Court does not conclude that there is no possible evidence that would support a denial of benefits. The appropriate remedy in this situation, therefore, as the Second Circuit noted in *Miles*, is to return this case to the administrator for reconsideration based on the entire administrative record. *See id.* at 490 ("Our precedents make clear that even where we conclude a plan administrator's finding was arbitrary and capricious, we will typically not substitute our own judgment, but rather will return the claim for reconsideration unless we 'conclude that there is no possible evidence that could support a denial of benefits.' . . . Among other things, remand will afford Principal the opportunity to consider the evidence under the appropriate legal standards and, if it wishes, to evaluate Miles. We do not suggest that those are the only appropriate considerations on remand, and we intend no limitation by mentioning them. Principal is expected to provide a full and fair reconsideration of Miles's claim." (quoting *Miller v. United Welfare Fund*, 72 F.3d at 1074)); *see also Shore v.*

---

report only stated that a "formal neuropsychological test would be *helpful* for the continued evaluation of the claimant's proclaimed functional impairments related to cognitive deficits." (VAL 348 (emphasis added).) Although Aetna's initial claim denial letter to plaintiff noted the lack of "objective evidence of neurological dysfunction" as a reason why her claim was initially denied, defendant merely suggested that plaintiff *could* submit (among other things) "clinical findings" in support of her appeal, without any specificity as to what objective findings it would require to be shown through cognitive or neuropsychological testing before accepting plaintiff's claim. The Court, therefore, cannot find in the record any support for defendant's claim that it expressly notified plaintiff that some particular objective finding was required in order for her claim to be successful. Moreover, though defendant argues that plaintiff at all stages "failed to provide any clinical findings from any physical examinations conducted by her treating physicians, nor did she provide test results from any formal or structured cognitive testing as referenced in Aetna's initial adverse determination letter" (Def.'s Mem. of Law at 22)—apparently viewing Dr. Sirois' reports regarding plaintiff's objective symptoms as insufficient—such evidence clearly was not absolutely required to find plaintiff's condition constituted a functional impairment, given that defendant found plaintiff to be functionally impaired through June 30, 2012, notwithstanding that purported deficiency. (VAL 500.) Defense counsel at oral argument argued that an administrator could be entitled to accept plaintiff's claim based on subjective complaints for some period of time, but then at a point require objective evidence to continue the allowance of benefits; counsel did not offer (nor can the Court find) any legal support for this standard, and, moreover, under *Hobson*, that requirement would also have had to be clearly stated to plaintiff. Defendant, therefore, based on the administrative record that currently exists in this particular case, would not be entitled to rely on a purported lack of objective findings to deny plaintiff's claims solely because her complaints are subjective in nature.

---

[20] In light of this conclusion, plaintiff's argument that defendant had a conflict of interest is moot, and the Court does not address it.

*Painewebber Long Term Disability Plan*, No. 04-CV-4152 (KMK), 2007 WL 3047113, at *14 (S.D.N.Y. Oct. 15, 2007) ("At this time, the Court is not prepared to find that Reliance is unwilling or unable to fairly evaluate Plaintiff's claim for benefits, and Plaintiff points to nothing in the record, other than Reliance's denial of her claim, that proves otherwise."); *Robinson v. Metro. Life Ins. Co.*, No. 05 Civ. 1534 (LLS), 2006 WL 1317019, at *2 (S.D.N.Y. May 12, 2006) (granting summary judgment and remanding claim for reconsideration because "there is no basis for granting Ms. Robinson's claim and directing MetLife to provide her with long-term disability benefits. The record evidence is insufficient to compel the finding that a reasonable fiduciary must grant her claim.").

## VI. CONCLUSION

For the foregoing reasons, after careful review of the entire administrative record, and according Aetna a deferential standard of review, the Court concludes that defendant's decision to terminate plaintiff's long term disability benefits beyond June 30, 2012 failed to address substantial evidence in the record, and was thus arbitrary and capricious as a matter of law. Plaintiff's claim is, therefore, remanded to Aetna for reconsideration, including the updated November 29, 2012 APS report from Dr. Sirois, his supporting office visit notes, the Pasternak vocational expert report, and plaintiff's affidavit.

Finally, "[t]he court recognizes that Plaintiff has been without benefits for an extended period of time. Therefore, the Court will retain jurisdiction over this case pending the remand and require that the administrator act expeditiously to resolve Plaintiff's claim." *Shore*, 2007 WL 3047113, at *15 (citing *Neely v. Pension Trust Fund of the Pension, Hospitalization and Benefit Plan of the Elec. Indus.*, No. 00-CV-2013, 2003 WL 21143087, at *12 (E.D.N.Y. Jan. 16, 2003)). "To that end, [Aetna] is to reconsider and render its decision within thirty days of receipt of . . . any . . . evidence developed subsequent to the filing of the cross-motions for Summary Judgment. . . . The parties are directed to report the status of the remand on the 60th and 120th days after the date of this Opinion and Order. All other proceedings before this Court are stayed pending further order of the Court, and the case is placed on the suspense docket." *Shore*, 2007 WL 3047113, at *15; *see also Badawy v. First Reliance Standard Life Ins. Co.*, No. 04 CIV. 01619 (RJH), 2005 WL 2396908, at *14 (S.D.N.Y. Sept. 28, 2005) ("This court shall retain jurisdiction of this matter, but the Clerk of the Court is directed to close this case for administrative purposes unless restored to the active calendar on motion of any party.").

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: August 25, 2015
      Central Islip, NY

\* \* \*

Plaintiff is represented by Ronald L. Epstein, Grey and Grey LLP, 360 Main St., Farmingdale, NY 11735. Defendant is represented by Michael Bernstein, Sedgwick LLP, 225 Liberty St., 28th Floor, New York, NY 10281.